Filed 11/19/15  Today's IV v. Los Angeles County Metropolitan Transp. Authority CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| TODAY'S IV, INC., dba WESTIN BONAVENTURE HOTEL AND SUITES | B260855 |
| Plaintiff and Appellant | (Los Angeles County Super. Ct. No. BS137540) |
| v. | |
| LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, | ORDER MODIFYING OPINION AND  DENYING REHEARING |
| | [NO CHANGE IN JUDGMENT] |
| Defendant and Respondent. | |

The opinion filed on October 28, 2015, is modified as follows:

On page 33, lines 11-12, delete sentence: "The environmental impact report was certified on January 20, 2012."

On page 34, lines 10-11, delete sentence: "As noted, the environmental impact report was certified on January 20, 2012."

On page 34, delete the last paragraph:

"We need not address whether the development of post-certification feasibility evidence can require that an already certified environmental impact report be recirculated.  And we need not decide whether the post-certification development of aspects of a project's feasibility may impeach an earlier environmental impact report certification determination.  Here, there is no substantial evidence the lower tunneling profile raised in the April 26, 2012 order was financially feasible."

The rehearing petition is denied.


_____     _____     _____

TURNER, P.J.                KRIEGLER, J.                BAKER, J.

2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| TODAY'S IV, INC., dba WESTIN BONAVENTURE HOTEL AND SUITES<br><br>　　　Plaintiff and Appellant<br><br>　　　v.<br><br>LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY,<br><br>　　　Defendant and Respondent. | B260855<br><br>(Los Angeles County<br>Super. Ct. No. BS137540) |

APPEALS from the judgment of the Superior Court of Los Angeles County, Richard Fruin, Judge.  Affirmed in part and dismissed in part.

The Silverstein Law Firm, Robert P. Silverstein and Bradly S. Torgan; Law Office of Christopher Sutton and Christopher Sutton for Plaintiff and Appellant.

Mark  J. Saladino, County Counsel, Mary C. Wickham, Acting County Counsel, Charles M. Safer, Assistant County Counsel, and Ronald W. Stamm, Principal Deputy County Counsel; Remy Moose Manley, Whitman F. Manley, Tiffany K. Wright, Jennifer S. Holman and Jeannie Lee for Defendant and Respondent.

# I. INTRODUCTION

Plaintiff, Today's IV, Inc., operates the Westin Bonaventure Hotel and Suites in Downtown Los Angeles (the hotel). Defendant, The Los Angeles County Metropolitan Transit Authority, is undertaking the construction of a subway and three subway stations. The project is entitled the Regional Connector Transit Connector Project (the project). The subway will directly link the 7th Street/Metro Center to the Gold Line light-rail system in the Little Tokyo section of Downtown Los Angeles.

Because of partial federal funding for the project, the Federal Transit Administration was required to conduct environmental review pursuant to the National Environmental Policy Act. (42 U.S.C. § 4321 et seq.) Apart from a dispute concerning public record disclosure, plaintiff's challenges arise under the California Environmental Quality Act. (Pub. Resources Code[1], § 21000 et seq.) Under these circumstances, an environmental impact report/environmental impact study must be jointly prepared by federal and local authorities. (*Environmental Protection Information Center v. California Dept. of Forestry and Fire Protection* (2008) 44 Cal.4th 459, 472; Cal. Code of Regs., tit. 14, § 15220 et seq. (Guidelines[2]).) For clarity's sake, the final environmental impact report/environmental impact study will be referred to as the environmental impact report.

Plaintiff appeals from the judgment upholding defendant's certification of the environmental impact report and denying a California Public Records Act (Public Records Act) request. (Gov. Code, § 6250 et seq.) We shall review the environmental impact report only for violations of the California Environmental Quality Act although it was jointly prepared with federal authorities. Defendant contends in its cross-appeal that

---

[1]     All further statutory references are to the Public Resources Code unless otherwise indicated.

[2]     References to Guidelines are to those located in California Code of Regulations, title 14, section 15000 et seq. The Guidelines are promulgated by the California Natural Resources Agency to implement the California Environmental Quality Act. (§ 21083, subd. (e); *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 448, fn. 4.)

the project is exempt from environmental review.  We conclude the trial court correctly ruled defendant could properly certify the environmental impact report as it relates to plaintiff.  We further conclude plaintiff may not challenge the trial court's adverse decision in the Public Records Act dispute on direct appeal.  Because we affirm the judgment, this disposition obviates the need to address defendant's cross-appeal.  We therefore dismiss defendant's cross-appeal as moot.

## II.  PLAINTIFF'S CHALLENGES TO CERTIFICATION OF THE ENVIRONMENTAL IMPACT REPORT AND PUBLIC RECORDS ACT ALLEGATIONS

### A.  Plaintiff's Verified Mandate Petition and Injunctive Relief Complaint

On May 25, 2012, plaintiff filed its verified mandate petition and injunctive relief complaint.  According to the petition and complaint, the hotel consists of 1,354 guest rooms and suites, convention and other facilities and numerous restaurants.  The hotel occupies the entire city block bounded by Figueroa Avenue and Fourth, Fifth and Flower Streets.  Vehicle access into the hotel's underground parking lot is available only by means of a single driveway from Flower Street.

The first cause of action seeks issuance of a writ of mandate because defendant violated the Public Records Act.  According to the first cause of action, defendant improperly asserted exemptions for disclosure of public records and failed to produce the "Flower Street Tunneling Study" in response to plaintiff's request.  The remainder of plaintiff's claims relate to the California Environmental Quality Act.

The second through fifth causes of action seek issuance of a writ of mandate because the environmental impact report does not comply with specified California Environmental Quality Act provisions.  In the second cause of action, plaintiff alleges the environmental impact report fails to support ecological conclusions concerning the following:  baseline of geotechnical conditions within and around the hotel structures that

3

will be impacted by vibration and excavation activities; vehicular access and egress; disability access; emergency access, evacuation and human safety; temporary construction easements; noise; the exclusion of a tunnel boring machine from portions of the financial district; financial detriments; and grade separation on Flower Street that will result from the use of "cut and cover" construction method.

The third cause of action alleges the environmental impact report fails to adopt feasible mitigation measures or alternatives. According to the mandate petition and injunctive relief complaint, the cut and cover construction method will result in numerous significant impacts which are described in the second cause of action. In connection with the cut and cover construction method, plaintiff alleges defendant failed to adopt a feasible alternative that would have far less serious environmental impacts. Plaintiff alleges: "[Defendant] did not adopt an alternative to the 'cut and cover' construction method even though feasible alternatives exist which would result in far less severe environmental impacts, including but not limited to the [tunnel boring machine] method. There is no substantial evidence in the record supporting a conclusion that use of the [tunnel boring machine] method is infeasible in the Financial District or supporting compelling overriding considerations to support [defendant's] decision not to revise this aspect of the [p]roject in the Financial District when it made such a modification for the Little Tokyo area and in the Financial District between [Third] and [Fourth] Streets, but not further along Flower Street."

In addition, in the third cause of action, plaintiff alleges the mitigation measures for certain of the problems identified in the second cause of action are predicated on studies that will occur in the future. The second cause of action alleges: "The [environmental impact report] offers only improperly deferred mitigation in violation of [the California Environmental Quality Act]. By contrast to such vague assurances of possible future action, [the California Environmental Quality Act] requires that the [environmental impact report] provide specific mitigation measures to address these impacts not only to ensure that the level of impact will indeed be reduced to a less than significant level, but also to determine whether the mitigation, itself, creates any other

4

impacts that must in turn be addressed.  [Defendant] failed to comply with this requirement."

The fourth cause of action alleges that there were significant changes in the environmental impact report which required its recirculation.  Presumably, plaintiff is alleging the changes to project required recirculation of the environmental impact report. Plaintiff identifies two significant changes to the draft and final environmental impact reports which warranted recirculation of the environmental impact report.  To begin with, the project uses a tunnel boring machine to construct a tunnel from the Little Tokyo area towards Fourth and Flower Streets.  Then the project utilizes the cut and cover technique on Flower Street between Third and Fourth Streets.  (We will explain shortly the with greater precision where the tunnel boring machine and cut and cover construction methods are to be utilized.)  Plaintiff asserts there will be a grade separation on Flower Street during construction by as much as 24 inches.  In the second cause of action, plaintiff alleges this grade separation will foreseeably result in significant impacts on traffic in the Financial District including access to freeways and other properties.  In the fourth cause of action, according to plaintiff, the grade separation issue arose after the circulation of the draft and supplemental environmental impact reports.  Thus, before certification of the environmental impact report, the document should have been recirculated to allow public comment on the grade separation impact issue.

The fifth cause of action alleges that the environmental impact report fails to consider future planned construction.  According to plaintiff, there is a planned station to be built in the Financial District, but only in the future.  This planned station is "admittedly still part of the[p]roject" although its future construction is dependent upon the availability of financing.  Therefore, plaintiff alleges, "[Defendant's] failure to fully analyze the [new s]tation in the [environmental impact report] as part of the [p]roject constitutes improper piecemealing in violation of [the California Environmental Quality Act]." In the sixth cause of action, plaintiff seeks injunctive relief to maintain the status quo and to enjoin defendant from proceeding with the project until there is an opportunity for full judicial review.  In its answer, defendant denies generally all the material

5

allegations of the petition and complaint.  In addition, defendant asserts 13 affirmative defenses, including exemption from the requirements of the California Environmental Quality Act.

Plaintiff's motion for a preliminary injunction was denied.  Later, the petition was denied.  Judgment was entered in defendant's favor on all of plaintiff's claims in the petition and complaint.

## B.  Challenges on Appeal

Plaintiff presents the following six challenges to defendant's certification of the environmental impact report.  First, defendant decided to use cut-and-cover construction along Flower Street south of Fourth Street to 7th Street/Metro Center.  The parties refer to the area just south of the hotel Lower Flower Street.  This determination was made without first analyzing the alternative feasible construction methods of closed-face and open-face tunneling.  Second, the environmental impact report improperly defers analysis of geotechnical impacts and formulation of mitigation measures for the resulting adverse ecological effects.  Third, the environmental impact report's analysis of vehicular ingress and egress impacts is insufficient.  Fourth, the environmental impact report fails to contain any analysis of the impacts resulting from the potential grade separation of up to 24 inches.  According to plaintiff, the present street grade will be increased up to 24 inches higher as a result of the project.  Fifth, the environmental impact report fails to analyze the full scope and duration of both the noise and the illumination and glare impacts from nighttime construction.  Sixth, defendant failed to re-circulate the environmental impact report in view of significant new impacts.  Additionally, plaintiff contends the judgment must be reversed, because it prevailed on its Public Records Act claim.

6

III. PLAINTIFF'S APPEAL

A. Feasible Construction Methods

1. Plaintiff's argument

Plaintiff contends the environmental impact report fails to analyze the use of tunnel boring machine technology to construct the subway under Flower Street to the south of Fourth Street. According to plaintiff, open-face tunneling construction methods are actually or potentially feasible alternatives to the cut-and-cover construction method called for by the environmental impact report. However, there is substantial evidence the closed- and open-face tunneling boring machine methods are not feasible alternatives to the cut and cover technique.

2. Standard of review

The gravamen of plaintiff's position is the environmental impact report fails to meet statutory requirements for good-faith investigation and disclosure of the projects adverse ecological effects. An environmental impact report's fundamental purpose is to inform public officials and the people they serve of any significant adverse effects a project is likely to have on the environment. (§ 21061; *Neighbors for Smart Rail v. Exposition Metro Line Const. Authority, supra,* 57 Cal.4th at p.; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428.) We presume the correctness of defendant's decisions in the environmental impact report context. (*San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 11; *State Water Resources Control Board Cases* (2006) 136 Cal.App.4th 674, 723.) Our Supreme Court describes the limited nature of our review: "In reviewing agency actions under [the California Environmental Quality Act], . . . section 21168.5 provides that a court's inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.

7

Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.'" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564; see *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 195.)

Thus, our standard of review depends upon the nature of the challenge to an environmental impact report: "In evaluating an [environmental impact report] for [California Environmental Quality Act] compliance, then, a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts. For example, where an agency failed to require an applicant to provide certain information mandated by [the California Environmental Quality Act] and to include that information in its environmental analysis, we held the agency 'failed to proceed in the manner prescribed by [the California Environmental Quality Act].' (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236; see also *Santiago County Water Dist. v. County of Orange* [(1981)] 118 Cal.App.3d [818], 829 [[environmental impact report] legally inadequate because of lack of water supply and facilities analysis].) In contrast, in a factual dispute over 'whether adverse effects have been mitigated or could be better mitigated' (*Laurel Heights* [*Improvement Assn. v. Regents of University of California* (1988) ] 47 Cal.3d [376,] 393), the agency's conclusion would be reviewed only for substantial evidence." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova*, *supra*, 40 Cal.4th at p. 435.) The gravamen of all plaintiff's contentions concerning feasible construction methods and mitigation measures pertain to its factual disagreements with the environmental impact report's conclusions. Thus, our standard of review as to defendant's environmental conclusions is for substantial evidence.

In terms of the correctness of defendant's environmental conclusions, our Supreme Court has explained: "Thus, the reviewing court '"does not pass upon the correctness of the [environmental impact report's] environmental conclusions, but only upon its sufficiency as an informative document."' [Citations.] We may not set aside an

8

agency's approval of an [environmental impact report] on the ground that an opposite conclusion would have been equally or more reasonable." (*Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d at p. 564, quoting *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 392 and *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 189.) In a similar vein, our Supreme Court has explained: "'A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so.'" (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 574 citing *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 393.) Therefore, we defer to defendant's resolution of conflicting engineering opinions and evidence. (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 574; accord *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1042.) The foregoing standard of review applies to all of plaintiff's environmental impact arguments except for the deferral and recirculation contentions.

### 3. The setting

The project consists of a 1.9 mile subway as part of defendant's light rail and subway system and attendant three new underground rail stations. The subway will run from the 7th Street/Metro Station under Flower Street essentially northeast to the new 2nd Street/Hope Station. The subway will then move in an easterly direction from the new 2nd Street/Hope Station east to the new 2nd Street/Broadway Station. The subway would terminate at the new 1st Street/Central Station in Little Tokyo.

Plaintiff challenges the use of the cut-and-cover method for construction of the project along the portion of Flower Street facing the hotel's east exterior. This segment of Flower Street runs from Fourth Street to just past Fifth Street. As we will explain, the

9

setting for this dispute involves the use of the cut and cover method on Flower Street to construct the subway which will proceed southbound from the hotel to the 7th Street/Metro Station.

4. The environmental impact report's construction method determinations

On September 3, 2010, defendant published the draft environmental impact report. The draft environmental impact report contemplates the use of the cut and cover technique for constructing the subway. According to the draft environmental impact report, the cut and cover technique would be used southbound between 2nd/Hope Street Station and 7th Street/Metro Station. Thus, the draft environmental impact report recommends use of the cut and cover technique between Flower Street immediately facing the hotel's east exterior to the 7th Street/Metro Station. The cut and cover technique of constructing a subway is described as follows in the draft environmental impact report: "This is a very common construction method for underground facilities and it entails excavating down from the ground surface. A temporary excavation support is provided to stabilize the ground and excavation is carried out inside the supported area. Temporary concrete decking can be placed over the cut immediately following the first lift of excavation (at about 12 to 15 feet below ground surface) to allow traffic to pass above. Once the deck is in place, excavation and internal bracing would continue to the required depth. Once the desired construction is completed inside the excavated area, the excavation is backfilled and the surface is restored permanently."

After the draft environmental impact report was circulated, defendant's directors board adopted a different version of the project. The October 28, 2010 version of the project eliminates the 5th/Flower Station contemplated by the draft environmental impact report. The October 28, 2010 version of the project calls for a fully underground subway. A supplemental environmental impact report was prepared and circulated for public comment on July 22, 2011. The project was modified by substituting the tunnel boring machine method for the cut-and-cover method for the construction commencing near

10

Second Street in Little Tokyo. The cut and cover method was replaced by the tunnel boring machine technique of subway construction all the way on Flower Street from Second to Fourth Streets. The supplemental environmental impact report discusses the use of a tunnel boring machine to construct the subway tunnels thusly: "[Tunnel boring machines] are large-diameter, horizontal drills that predominantly excavate circular tunnel sections. The excavated materials are removed through the tunnel using hopper type rail cars or by a conveyor system. As the machine advances, both the ground in front of the machine and the hole it creates are continually supported by the machine shield and pre-cast concrete tunnel liners. This method creates a tunnel with little or no disruption at the surface that is especially suitable for creating a circular opening at greater depths than would be practical for cut and cover construction. When the concrete tunnel liner has rubber gaskets between each segment, water is prevented from entering the tunnel and excavation can proceed below the ground water level." The use of the tunnel boring machine is to stop at Fourth Street. The use of the cut and cover technique is to be utilized southbound on Flower Street from Fourth Street to the 7th Street/Metro Station. Both the draft and supplemental environmental impact reports contemplate the cut and cover construction technique will be utilized southbound on Flower Street all the way to the 7th Street/Metro Station.

If feasible, defendant employs the tunnel boring machine method because "tunnel boring is far less disruptive to surface traffic and adjacent land uses" than the cut-and-cover method. This method uses "large-diameter horizontal drills that continuously excavate circular" tunnel sections. The use of earth-pressure balance machines, a type of tunnel boring machine with a closed-face pressurized cutting head, is defendant's preferred tunnel construction method. Where the tunnel boring machine is used, the closed-face pressurized cutting head method was the one selected for the project.

But the environmental impact report concludes that use of a tunnel boring machine south of Fourth Street is infeasible. The following discussion concerning the infeasibility of using a tunnel boring machine is based on the analysis prepared prior to the environmental impact report's certification. The environmental impact report found the

11

presence of tiebacks in the planned subway route on Flower Street south of Fourth Street makes use of a tunnel boring machine infeasible. The environmental impact report describes a tie-back: "Tiebacks consist of horizontal or inclined wire strands or steel rods installed in drilled holes in the ground behind the wall. One end of the tieback is secured to the wall and the other end is anchored to stable ground to provide sufficient resistance and to limit ground movement." The environmental impact report discusses the tie-back issue as it relates to the use of the tunnel boring machine technology: "Many of the existing structures adjacent to the alignment have underground basements that utilized temporary shoring and tieback systems during their original construction. The tiebacks were typically left in place and decommissioned after basement construction, in general accordance with local practice in the City of Los Angeles and southern California. These abandoned/decommissioned tiebacks could be encountered under many parts of Flower Street since the existing deep basement/parking garage used tiebacks to support the original excavations during construction. Steel tieback cables could pose a problem for tunnel boring machines. The cut and cover method provides greater flexibility and the ability to overcome underground obstructions more easily than the [tunnel boring machine] method. These obstructions would potentially be problematic for [tunnel boring machine] excavation on Flower Street due to the shallow depths of the tunnels, which is partly why cut and cover construction is planned for this area."

Also, in response to comments after circulation of the supplemental environmental impact report, defendant explains: "Flower Street from 4th Street to the existing tracks just south of 6th Street is highly constrained with existing subsurface tie-backs from previous construction projects that interfere with tunneling activity. Tunneling activities using a tunnel boring machine south of 4th Street are hindered as existing tie-backs are encountered. Each time a tie-back is encountered, tunneling would halt in order to allow the tie-back to be removed. This constraint renders tunnel boring machine construction not practicable in this area." Under Flower Street south of Fourth Street there are 403 known tie-backs that must be cut. Tiebacks will be encountered by a tunnel boring machine every seven feet. There are 212 total tiebacks on the west side of Flower Street.

12

There are 191 total tie backs on the east side of Flower Street.  Thus, the environmental impact report concludes that beginning at the intersection of Flower and Fourth Streets, the cut and cover technique will be used to construct the subway.

5.  Substantial evidence supports defendant's conclusion that use of the tunnel boring machine south of Fourth Street is infeasible

Substantial evidence supports the environmental impact report's finding that the use of a tunnel boring machine south of Fourth Street is infeasible. Attached to the draft environmental impact report is the technical memorandum entitled, "Alternate Study: More Tunneling on Flower Street."  The study, prepared by the Connector Partnership, concludes:  "In an ideal situation, tunneling under Flower Street would result in less disruption to traffic and business access compared to cut and cover construction.  Very significant and tacitly fatal flaws exist for tunneling (several site conditions and rail system requirements) and make tunneling under Flower Street not an acceptable method of construction."  The study identifies the hazards of the presence of tiebacks underneath on Flower Street as one of the factors that makes the use of a tunnel boring machine infeasible.  An updated Connector Partnership technical study identifies the presence of tie-backs coming from what was formerly known as the ARCO Plaza to under Flower Street.  Documents developed during the design phase of the project identify tiebacks emanating from:  the hotel; the Citicorp parking structure; the library parking structure; and the City National Bank building.

The Draft Baseline Geotechnical Report prepared by the Connector Partnership explains why the cut and cover technique should be used, "This method of construction was selected because of anticipated conflicts with hundreds of existing foundation tie-back anchors along this part of the alignment and considering the relatively shallow excavation depth."  The Connector Partnership's draft technical report on the design and construction of the subway on Flower Street states:  "In either the tensioned or untensioned state, tiebacks are a hazard to closed-face (pressurized face) [tunnel boring

13

machine] tunneling as the cutter head will be entangled in the works and can damage the [tunnel boring machine] and create excessive ground loss. The [tunnel boring machine] is not capable of 'chewing-up' or otherwise processing a steel tieback. Substantial down time is required to go ahead (in front) of the cutterhead to manually remove a tie[-]back." The Connector Partnership's draft technical report on the design and construction of the Flower Street subway continues: "Removal of tiebacks in advance of tunneling is theoretically possible to avoid the tieback hazard. In practice, the location of tiebacks needs to be identified. However, as-built records may not be available or not reliably documented for such temporary works. The risk of not finding and removing all the tiebacks remain. Geophysical techniques, such as a magnetometer, might be able to find some tiebacks, but if used in drill holes, would be like 'looking for a needle in a haystack.' A geophysical method at the ground surface is not known to exist that can simply find the tiebacks at depths of possibly 40 to 80 feet below the ground surface. The only practical direct method to remove the number of [tie backs] would require an independent trench excavation with ground support . . . to explore, cut, and remove tiebacks. The task of digging trenches along Flower [Street] . . . would have similar impacts to Flower Street as the tunnel cut and cover . . . methods, including . . . traffic and pedestrian disruption and . . . utility relocations."

Thus, substantial evidence supports the environmental impact report's finding that use of an open or closed face tunnel boring machine south of Fourth Street under Flower Street is infeasible. That there are conflicts in evidence emanating from defendant, including its own equivocal findings, does not permit us to set aside the certification of the environmental impact report. (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 572; accord *Environmental Council of Sacramento v. City of Sacramento, supra,* 142 Cal.App.4th at p. 1042.) Additionally, we need not address other grounds for findings of infeasibility including: the presence of groundwater; problems resulting from utilities; and the shallow depth of the 7th Street/Metro Station.

14

B.  Alleged Improper Analysis of Geotechnical Impacts on Structures Within The
Construction Zone and Deferral of Mitigation Measure Formulation

1.  Baseline

Plaintiff argues there is an insufficient discussion of the physical baseline conditions in the project area.  The environmental impact report must identify baseline conditions.  Our Supreme Court has explained:  "The fundamental goal of an [environmental impact report] is to inform decision makers and the public of any significant adverse effects a project is likely to have on the physical environment. (§ 21061; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova*[*, supra,*] 40 Cal.4th [at p.] 428.)  To make such an assessment, an [environmental impact report] must delineate environmental conditions prevailing absent the project, defining a 'baseline' against which predicted effects can be described and quantified.  (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315.)"  (*Neighbors for Smart Rail v. Exposition Metro Line Const. Authority*, *supra*, 57 Cal.4th at p. 447.)

Contrary to plaintiff's contention, the environmental impact report comprehensively discusses the baseline conditions as it relates to geotechnical issues. Appendix U, a technical memorandum, was prepared by the Los Angeles consulting firm of Camp Dresser & McKee, Inc. which is commonly referred to as CDM.  The senior project manager for CDM was Virginia Jackson who had over 25 years experience working on transportation matters.  CDM began environmental and engineering work on the project in July 2007.  Appendix U discusses:  the potential for adverse impacts related to liquefaction or seismically induced settlement; the absence any potential for adverse impacts related to fault rupture and other geological events; and a comprehensive evaluation methodology to be used in assessing geotechnical analysis.  Appendix U sets forth:  the regional geology; faulting and seismicity; current and potentially active faults and their distance from the project; and blind thrust fault zones.  Appendix U explains

15

that tunneling has the potential for adverse impacts related to ground settlement and differential settlement immediately above the alignment. Finally, Appendix U concludes that with mitigation, potential impacts would be less than significant in connection with: ground loss due to tunnel construction; liquefaction; presence of subsurface gases; and hazardous materials in the project area. In terms of baseline geological conditions, the environmental impact report complies with the requirement it inform public officials of the existing environment. (See *Fall River Wild Trout Foundation v. County of Shasta* (1999) 70 Cal.App.4th 482, 492; *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712.)

## 2. Mitigation measure issues

The environmental impact report concludes that the project has the potential for adverse effects related to: liquefaction; seismically-induce settlement; ground loss due to tunnel construction; and landslides. The environmental impact report identifies 21 mitigation measures. In terms of plaintiff's improper deferral contention, mitigation measure GT-1 states: "Before any construction, a survey of structures within the anticipated zone of construction influence shall be conducted in order to establish baseline conditions. A geotechnical instrumentation and settlement monitoring plan and mitigation measures shall be developed and adhered to during construction to ensure appropriate measures are taken to address any construction-induced movement. If assessments indicate the necessity to proactively protect nearby structures, additional support for the structures by underpinning or other ground improvement techniques shall be required prior to the underground construction. [Defendant] shall require the construction contractor to limit movement to less than acceptable threshold values for vertical, horizontal, and angular deformation as a performance standard. These acceptable threshold values shall be established such that the risk of damage to buildings and utilities will be negligible to very slight. For buildings, these threshold values will be based on the relationship of building damage to angular distortion and horizontal strain

16

consistent with Boscardin and Cording (1989) and qualitative factors including but not limited to the type of structure and its existing condition.  For utility mains, these threshold values shall be those established by the utility owners.  Additional data and survey information shall be gathered during final design for each building and utility main to enable assessment of the tolerance of potentially affected structures and utilities. Additional engineering and design level geotechnical studies shall be performed to define the nature of the soils and to refine the means of achieving each performance specification.  (GT-1)"  Other geotechnical and subsidence mitigation measures include: GT-2, ground improvement methods; GT-3, tunnel alignment grouted in advance; GT-4, monitoring devices along the route; and GT-5, use of particular machinery.  The environmental impact report concludes, "With mitigation, potential effects related to geologic, subsurface, or seismic hazards would be reduced to a less than significant level."

Taken together, as demonstrated below, there is substantial evidence these mitigation measures are sufficient to reduce the subsidence risks to less than significant levels.  (See *Friends of Kings River v. County of Fresno* (2014) 232 Cal.App.4th 105, 123 [three related mitigation measures considered together].)  Appendix U to the environmental impact report consists of a technical memorandum on geotechnical, subsurface, seismic and hazardous materials.  The technical memorandum was prepared by CDM.

The technical memorandum evaluates impacts associated with the project area's geological conditions and concludes the proposed tunneling would give rise to potential adverse subsidence impacts.  The technical memorandum recommends certain measures to mitigate against potential subsidence:  a preconstruction study; construction monitoring; and limiting potential settlement to below an acceptable threshold value established during the final project design.  These enumerated mitigation strategies are included as part of mitigation measure GT-1. As noted, other proposed mitigation approaches are reflected in mitigation measures GT-2 through GT-5.

17

The February 3, 2012 final draft of the Building and Adjacent Structure Protection Report prepared by the Connector Partnership indicates, "As soon as any of the above buildings show a settlement value greater than 0.25 inches, compensation grouting will be activated under the building in order to counteract the settlement developing under it." Compensation grouting was described as an effective structure protection and settlement mitigation method. The report concludes that by applying grout to a settlement of 0.25 inches, the damage would be negligible.

The April 2012 technical memorandum prepared by Ray Sosa and Bill Hansmith explains the use of the Boscardin and Cording method, which predicts potential damage to various structures. This technique was used to evaluate tunneling impacts on buildings adjacent to the alignment as required by mitigation measure GT-1. This method has gained worldwide acceptance in engineering practice. Further, by using compensation grouting, "[T]he settlement under these buildings could be controlled to acceptable levels." Substantial evidence supports defendant's less than significant impact findings after implementation of the potential subsistence mitigation measures. As with other issues, plaintiff's remaining subsidence contentions amount to an unpersuasive effort to have us reassess conflicting engineering opinions; something we are prohibited from doing. (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 572; *Environmental Council of Sacramento v. City of Sacramento*, *supra*, 142 Cal.App.4th at p. 1042.)

Further, there is no merit to plaintiff's deferral argument. Plaintiff relies on Guidelines, section 15126.4, subdivision (a)(1)(B) which provides in part: "Formulation of mitigation measures should not be deferred until some future time. However, measures may specify performance standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way." Plaintiff is correct that environmental planning documents which merely defer formulation of mitigation measures may fail to comply with Guidelines section 15126.4, subdivision (a)(1)(B). (1 Kostka & Zischke Practice Under the California Environmental Quality Act

18

(Cont.Ed.Bar 2015) § 14.12, p. 14-14 to 14-15; *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 281.)

In *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 735-738, the Fifth Appellate District Court of Appeal reviewed prior decisions allowing for deferred formulation of mitigation measures. After analyzing those cases, our Fifth District colleagues concluded: "The foregoing cases demonstrate that the exception allowing the deferral of the formulation of mitigation measures has been expressed in a variety of ways. From these cases, we glean two principles that are important to this case. First, the deferral of the formulation of mitigation measures requires the agency to commit itself to *specific performance criteria* for evaluating the efficacy of the measures implemented. Second, the 'activity' constituting the [California Environmental Quality Act] project may not be undertaken without mitigation measures being in place 'to minimize any significant adverse effect on the environment of the activity.' (§ 21080.5, subd. (d)(3)(A).) In other words, the deferral relates only to the *formulation* of mitigation measures, not the mitigation itself. Once the project reaches the point where activity will have a significant adverse effect on the environment, the mitigation measures must be in place." (*POET, LLC v. State Air Resources Bd., supra,* 218 Cal.App.4th at pp. 737-738; see 1 Kostka & Zischke, *op. cit.*, § 14.12, pp. 14-14 to 14-15.) Here, as noted above, specific performance criteria have been imposed by the mitigation measures. The April 2012 technical memorandum prepared by Mr. Sosa and Mr. Hansmith describes the Boscardin and Cording method, which predicts potential structural damage, as having received worldwide acceptance.

And decisional authority recognizes it is proper to defer formulation of geotechnical mitigation measures: "These mitigation measures appear to us to fall squarely within the rule of [*California Native Plant Society*] that 'when a public agency has evaluated the potentially significant impacts of a project and has identified measures that will mitigate those impacts,' and has committed to mitigating those impacts, the agency may defer precisely how mitigation will be achieved under the identified measures pending further study. [(*California Native Plant Society v. City of Rancho*

19

*Córdova* (2009) 172 Cal.App.4th 603, 621.)]  The Building Code and City regulations require investigation and recommendations to avoid seismic hazards; in fact, under City ordinances, a registered civil engineer is required to recommend corrective action that is '*likely to prevent structural damage to each structure*.'  (Italics added.)  The [environmental impact report] and the Geotechnical Investigation provide evidence that mitigation is feasible and discuss a range of mitigation measures, including the Geotechnical Investigation's recommendation of the use of deep foundation systems, as well as requirements for piles, site grading requirements, and seismic design requirements for structural designs, all of which the Revised [environmental impact group] reported were standard, accepted, and proven engineering practices.  In addition, Mitigation Measure F.2 lists further possible methods to reduce the risk of liquefaction. Finally, the mitigation measures required compliance with all geotechnical mitigations contained in the site-specific geotechnical investigations in the plans submitted for all relevant construction permits.  As in *Gentry*, the plans are 'subject to a host of specific performance criteria imposed by various ordinances, codes, and standards, as well as other mitigation conditions.'  (*Gentry* [*v. City of Murrieta* (1995)] 36 Cal.App.4th [1359,] 1395.)  It is reasonable to expect that these environmental regulations will be followed. (See *Sundstrom* [*v. County of Mendocino* (1998)] 202 Cal.App.3d [296,] 308-309.)" (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 910.) Therefore, no improper deferral of preparation of mitigation measures has occurred.


## C.  Vehicular Ingress and Egress Impacts


Plaintiff contends the environmental impact report's analysis of vehicular ingress and egress impacts is insufficient.  Substantial evidence supports the adequacy of vehicular ingress and egress impacts analysis including the effectiveness of the mitigation measures.  In a response during the public comment period, defendant stated:  "It may not be possible to keep all vehicular entrances to garages open at all times during operating hours.  But [defendant] would ensure that access is provided via other vehicular entrances

20

during those times as part of its goal to maintain access to businesses." Plaintiff asserts in light of this statement, the environmental impact report was required to identify additional mitigation measures. According to plaintiff, these mitigation measures must apply when construction blocks vehicular access to the hotel, which has only a single entrance and exit for vehicles.

To begin with, defendant argues this entire issue has been forfeited. Defendant argues the opening brief fails to identify any of the mitigation measures designed to mitigate to insignificant levels traffic and access issues. We agree the issue has been forfeited. The opening brief does not objectively identify many of the numerous steps defendant is obligated to undertake in order to mitigate the traffic and access issues. Further, the opening brief incorrectly claims there is "no" mitigation designed to ameliorate construction related impacts. Thus, the failure to objectively discuss the mitigation measures forfeits the traffic and access issues. (Cal. Rules of Court, rule 8.204 (a)(2)(C); *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1265-1266.)

Nonetheless, the environmental impact report discusses baseline conditions and potential adverse access and traffic issues. Among the matters identified in the Safety and Security technical memorandum prepared by CDM, which is Appendix CC to the environmental impact report, are: existing roadways near the hotel; existing crime statistics and safety related events near the hotel; the effect of construction on the speedy first responder access to emergencies; pedestrian safety; and the increased risk of traffic accidents during construction. The environmental impact report concludes the cumulative impacts will be mitigated to less than a significant level. Further, the draft environmental impact report discusses potential construction mitigation measures including: alternate walkways to comply with the Americans with Disabilities Act; marking pedestrian detour locations around construction sites; coordinating work and traffic control measures; and the development of a construction mitigation plan during the

21

final design phase. The environmental impact report thus identified circumstances which can give rise to adverse impacts.

In any event, defendant is obligated by the terms of various mitigation measures to maintain safe 24-hour access to the hotel. The mitigation measures in the environmental impact report sets forth defendant's obligation to ensure no such blockage occurs. Mitigation measure SS-15 requires: "[Defendant] shall keep sidewalks, entrances to buildings, lobbies, corridors, aisles, doors, or exists that remain in use by the public clear of obstructions. [Defendant] shall post appropriate warnings, signs, and instructional safety signs. These requirements shall be included in the construction specifications." In response to public comments, the extent of mitigation measure SS-15 was explained: "[Defendant] would keep entrances and exits clear of obstructions, and would ensure that adequate exit routes and safe zones are maintained at all times during construction, as indicated in Section 4.15.4.2.1 of this [environmental impact report] and mitigation measure number SS-15 in the Mitigation Monitoring and Reporting Program for the Locally Preferred Alternative (Chapter 8 of this [environmental impact report]). [Defendant] would not allow construction activities to impede safe evacuation of the buildings at any time."

Mitigation measure TR-1 requires, "Access to adjacent businesses shall be maintained via existing or temporary driveways at all times during business hours, and to residences at all times." In response to public comments, defendant explained the extent of mitigation measure TR-1: "As stated in Section 3.4.1.4 of the [draft environmental impact report], Section 3.4.2 of this [environmental impact report], and mitigation measure number TR-1 in the Mitigation Monitoring and Reporting Program for the Locally Preferred Alternative (Chapter 8 of this [environmental impact report]), access to businesses would be maintained during business operating hours throughout construction. This includes late-night businesses such as the 24-hour gym." At another point while responding to public comments, defendant emphasizes that it is obligated to maintain "access" to 24-hour businesses.

Further, construction on the hotel's Flower Street side is subject to regulations imposed by: the fire and police departments and other first responding agencies; the requirements of the Americans with Disabilities Act; and the requirements of the Architectural Barriers Act. Mitigation measure CN-2 states, "Traffic management and construction mitigation plans shall be developed in coordination with the community to minimize disruption and limit construction activities during special events." Additionally, mitigation measure CN-2 requires worksite traffic control plans to be developed in connection with the Los Angeles Department of Transportation to accommodate this pedestrian and vehicular traffic. Mitigation measures CN-4 and CN-5 require community outreach and notification concerning construction activities including the availability of a 24-hour hotline. Mitigation measure DR-5 prohibits defendant from hindering access to any public parking lot which would includes the one owned by plaintiff. Substantial evidence supports defendant's finding that no significant adverse effect will occur during the construction on the hotel's Flower Street side.

## D. Grade Separation Potential

Plaintiff contends the environmental impact report fails to contain any analysis of the potential grade separation of up to 24 inches between the construction decking and the prior street grade. Plaintiff argues that the grade separation will impede pedestrian and vehicular passage. The report is not deficient in this regard.

Because of the use of the cut-and-cover construction method, temporary concrete decking will be installed over excavated parts of Flower Street. As explained previously, the decking will allow vehicle and pedestrian traffic to pass above construction activities occurring beneath the street. Such decking will be either flush with the existing street level or raised above that surface. If the decking is raised, ramps compliant with the Americans with Disabilities Act will be installed. Defendant's director's board adopted this modification, "South of 4th Street construction decking shall be no higher than 10

23

[inches], *if feasible*, above the existing grade, and flush with existing curb on the east and west side of Flower Street with a maximum gross gradient of 3%." (Italics added.)

Seizing on the phrase "if feasible," plaintiff assumes defendant is empowered to elevate the decking beyond 10 inches. According to plaintiff, defendant may elevate the decking up to a potential 24 inches above the existing grade. This assumption is not grounded in the record. Rather, defendant is constrained from unilaterally determining decking may exceed that 10 inch upper limit. The upper height of the decking is subject to the restriction that the decking must be "flush with existing curb on the east and west side of Flower Street" And the maximum gross gradient will be three per cent over the curb height.

Further, defendant's planned Flower Street deck installation is subject to mitigation measures and other governmental restrictions. In the responses to comments, defendant also acknowledged, "[T]emporary (during construction) roadway configurations will be reviewed with [Los Angeles Department of Transportation] for compliance with roadway standards and designed to meet vehicle standards." Defendant also explained in the responses to comments: "Any decking configurations would require construction of [Americans with Disabilities Act]-compliant ramps and accesses as well as modifications to vehicular access points to the garages and driveway along Flower Street, as indicated in [the draft environmental impact report and environmental impact report]. Any decking configurations would be designed to accommodate pedestrians, the undercarriage and overhead clearances of vehicles using the driveways, garages and loading docks as indicated in the same sections. On another point, in responses to questions, defendant explains it will maintain access to plaintiff's property, including parking structures. In terms of other decking related concerns, defendant's responses to comments states there will adequate access to bus stops, shuttle areas, taxi drop-off areas and mid-block pedestrian crossings in all decking configurations.

E.  Nighttime construction noise, illumination and glare impacts

1.  Noise

Plaintiff contends the environmental impact report fails to analyze the full scope and duration of both the noise and the illumination and glare impacts from nighttime construction.  The environmental impact report analyzes construction noise and vibration.  The environmental impact report analysis is based in part on Appendix S, "Regional Connector Transit Corridor Noise and Vibration Technical Memorandum."  This technical memorandum was prepared by CDM and the Parsons Brinckerhoff firm.  The environmental impact report analysis examined both nighttime and daytime construction activities.

First, the environmental impact report discusses that during construction there will be construction-related noise.  In terms of the entirety of the project, the areas with the most potential for noise impacts include the cut and cover construction on Flower Street.  The reason for the potential for noise impact exists is because of the duration of construction and its proximity to the hotel.  Tables 4.7.11 and 4.7-15 quantify the anticipated noise levels during construction on Flower Street in the area south of Fourth Street.  However, the environmental impact report concludes that the noise impacts would be less than significant, "[E]stimated construction noise levels would not exceed [Federal Transit Authority] construction noise criteria . . . and impacts would be less than significant."  Substantial evidence supports defendant's findings in the environmental impact report that with mitigation construction noise levels will be reduced below significant levels.  The environmental impact report explains, "[T]he construction contractor [will] use [best management practices] to ensure construction-related noise levels do not exceed [Federal Transit Administration] construction noise criteria. . . ."  The environmental impact report describes in sufficient detail the best management practices and noise control devices to accomplish reduction in construction-related noise levels to below those specified by the Federal Transit Administration.  Also, pursuant to

25

the environmental impact report, "The construction mitigation plan shall prohibit noise levels generated during construction from exceeding the . . . Construction noise criteria." The environmental impact report discusses mitigation measures NV-13 through NV-17, which require: "noise levels may not exceed the Federal Transit Administration construction noise criteria"; this includes preventing simultaneous operation of major pieces of construction equipment if they exceed the aforementioned construction noise criteria; and if a noise complaint is received during project construction, monitoring shall be conducted in the vicinity of the area in question. If the monitored noise exceeds the Federal Transit Administration construction noise criteria, then the steps specified in mitigation measures NV-14 through NV-17 shall be implemented: "temporary noise barriers" shall be provided; alternative "back-up alarms/warning procedures" shall be used where feasible as needed; higher performance mufflers shall be used on equipment used during nighttime hours; and portable noise sheds for smaller, noisy equipment such as air compressors, dewatering pumps and generators shall be provided as needed.

The specifics of how much noise impacts actually will be generated and the mitigation measures will be implemented during construction of the project are not ascertainable beforehand. The environmental impact report is therefore not deficient for failing to disclose such unknown matters. Under these circumstances, delaying identification and implementation of more specific mitigation measures until such impacts arise is proper. (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1059-1060 [plan to be developed to clean up hazardous waste]; *see Oakland Heritage v. City of Oakland, supra,* 195 Cal.App.4th at p. 910.) It bears emphasis though that no noise levels above the Federal Transit Authority criteria will ever be permissible.

26

## 2. Glare and illumination

### a. exhaustion of administrative remedies

Defendant argues that plaintiff failed to exhaust its administrative remedies in connection with nighttime glare and illumination impacts. Defendant argues that no analysis was presented during the public comment period concerning the defect in the environmental impact report's discussion of illumination and glare impacts. We apply the following standards to defendant's exhaustion of administrative remedies contention: "'"No action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance [ ] were presented to the public agency orally or in writing . . . ." (§ 21177, subd. (a).)' (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535 (*Sierra Club*).) '"The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories *before* its actions are subjected to judicial review."' (*Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1138 (*Evans*), quoting *Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198.) Comments must express concerns so the lead agency has "'"its opportunity to act and to render litigation unnecessary."'" (*Sierra Club, supra,* 1623 Cal.App.4th at p. 535.) 'The purposes of the doctrine are not satisfied if the objections are not sufficiently specific so as to allow the Agency the opportunity to evaluate and respond to them.' (*Evans, supra,* 128 Cal.App.4th at p. 1138.) '"[R]elatively . . . bland and general references to environmental matters" [ ], or "isolated and unelaborated comment[s]"' do not satisfy the exhaustion requirement. (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 527[].) Rather, '"[t]he 'exact issue' must have been presented to the administrative agency. . . ."' (*Sierra Club, supra,* 163 Cal.App.4th at p. 535.) Requiring anything less 'would enable litigants to narrow, obscure, or even omit their arguments before the final administrative authority because they could possibly obtain a more favorable decision from a trial court.' (*Tahoe Vista Concerned Citizens v.*

27

*County of Placer* (2000) 81 Cal.App.4th 577, 594.) [¶] Exhaustion of administrative remedies is a 'jurisdictional prerequisite.' (*California Native Plant Society v. City of Rancho Cordova*[*, supra,*] 172 Cal.App.4th [at p.] 615[].) The petitioner has the burden of proof to show exhaustion occurred. (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 909 [].) Inasmuch as the issue of exhaustion is a question of law, '[a]n appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies.' (*Sierra Club, supra,* 163 Cal.App.4th at p. 536.)" (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 623-624 (*North Coast*).) We recognize there are varying levels of specificity adverted to in Court of Appeal opinions. (See 2 Kostka & Zischke, *op.cit.*, § 23.98, pp. 23-107 to 23-112.)

Plaintiff argues that the project's scope changed by the time of the environmental impact report's certification. Thus, according to plaintiff, there was no opportunity to raise any issues concerning the illumination and glare impacts. This contention has no merit. A representative of the City of Los Angeles expressed concern about nighttime construction during the public comment period. The letter stated, "[A]s desirable as night-time construction activity might be, any night-time activity adjacent [to] residential development must be strictly controlled so that residents are not disrupted by noise, light and dust from construction activities." Thus, defendants were on notice that there would be significant construction of the hotel's east side on Flower Street. Employees of the City of Los Angeles certainly were on notice as evidenced by the letter. Further, the generalized concern about nighttime lighting expressed in the letter was insufficient to preserve the issue. Moreover, the generalized concern expressed in the letter related to housing near the Historic Core of the city. This was insufficient to preserve the issue. (*North Coast, supra,* 216 Cal.App.4th at pp. 623-624; *Sierra Club, supra,* 163 Cal.App.4th at p. 536.)

b.  even if the issue is preserved, the environmental impact report's discussion concerning lighting and glare impacts is sufficient

Even if the issue had been preserved, the environmental impact report's discussion regarding lighting and glare impacts arising from nighttime construction on Flower Street is sufficient.  The environmental impact report discusses lighting and glare impacts arising from nighttime construction on Flower Street; e.g., installation of decking.  The report acknowledges "[t]emporary lighting" may be necessary during for nighttime construction and describes mitigation measures designed to restrict equipment use during nighttime construction.  Mitigation measure VA-3 requires defendant to shield temporary construction lighting to reduce spillover.

Further, the environmental impact report concludes nighttime construction will have a less than significant illumination and glare impacts.  Lighting is not expected to be necessary regularly and temporary walls will shield the construction staging areas from direct views.  The exception to this expectation involves security lighting.  And such lighting would be lower than the lighting sources employed by elevated buildings along Flower Street.  Plaintiff's challenges to the adequacy of the mitigation measures are nothing more than efforts to have us reweigh conflicting evidence and inferences.  We are prohibited from doing so.  (*Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d at p. 564; *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 392.)

F.  Recirculation of the environmental impact report

Plaintiff contends defendant improperly failed to re-circulate the environmental impact report in view of defendant's late changes to the project.  According to plaintiff, substantial changes include materially increasing the scope and duration of nighttime construction from a small number of days to one and one half years and eliminating the

29

pocket track.  Re-circulation was not required, because the new information was not significant under section 21092.1 and Guidelines, section 15088.5, subdivision (a).

Section 21092.1 requires recirculation of an environmental impact report when "significant new information" has been added after the public comment period. Recirculation of an environmental impact report is required under these circumstances: "A lead agency is required to recirculate an [environmental impact report] when significant new information is added to the [environmental impact report] after public notice is given of the availability of the draft [environmental impact report] for public review . . . but before certification.  . . .  [T]he term 'information' can include changes in the project or environmental setting as well as additional data or other information.  New information added to [a report] is not 'significant' unless the [report] is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement.  'Significant new information' requiring recirculation include, for example, a disclosure showing that:  [¶]  (1)  A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented.  [¶]  (2) A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance.  [¶] (3)  A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it.  [¶]  (4)  The draft [environmental impact report] was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded. (*Mountain Lion Coalition v. Fish & Game Com.* (1989) 214 Cal.App.3d 1043)." (Guidelines, § 15088.5, subd. (a).)  However, recirculation is not required under these circumstances, "Recirculation is not required where the new information added to the [report] merely clarifies or amplifies or makes insignificant modifications in an adequate [environmental impact report]."  (Guidelines, § 15088.5, subd. (b).)

30

Our standard of review of defendant's decision not to recirculate the environmental impact report is as follows: "We give [defendant's] determination substantial deference and presume it to be correct. [Plaintiff] bears the burden of proving substantial evidence does not support [defendant's] decision not to revise and recirculate the [final environmental impact report]." (*Western Placer Citizens for an Agricultural and Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 903; *Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497.) The Court of Appeal for the Fifth Appellate District has explained: "In other words, recirculation is not required simply because new information is added. As the California Supreme Court observed in *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112 . . ., 'the final [environmental impact report] will almost always contain information not included in the draft [environmental impact report]' given the . . . statutory requirements of circulation of the draft [environmental impact port], public comment, and response to these comments prior to certification of the final [environmental impact report]. (*Id.* at p. 1124.) But '[r]ecirculation was intended to be an exception, rather than the general rule.' (*Id.* at p. 1132.) [¶] An express finding is not required on whether new information is significant; it is implied from the agency's decision to certify the [environmental impact report] without recirculating it. [*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 6 Cal.4th at] p. 1133.)" (*South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 328.) On appeal, plaintiff has the burden of proving substantial evidence does not support defendant's decision not to revise and recirculate the environmental impact report. (*Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer, supra,* 144 Cal.App.4th at p. 903; *Sierra Club v. County of Napa, supra,* 121 Cal.App.4th at p. 1497.)

Plaintiff fails to demonstrate that any new information regarding nighttime noise, glare and illumination would be significant. As noted, substantial evidence supports defendant's finding that nighttime noise, glare and illumination effects would be insignificant. Therefore, in the absence of evidence that the nighttime noise, glare and

31

illumination impacts would be significant, defendant was not required to re-circulate the environmental impact report.

Further, there is no substantial evidence that using a lower alignment for the subway will be feasible. As noted, Guidelines, section 15088.5, subdivision (a) defines the term "significant new information" as follows, "A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it." And, plaintiff has the burden of demonstrating that the lower alignment for the subway would be feasible. (*South County Citizens for Smart Growth v. County of Nevada, supra,* 221 Cal.App.4th at p. 330; *Sierra Club v. County of Napa*, *supra*, 121 Cal.App.4th at p. 1497.)

Plaintiff has not sustained its burden of proving that the lower subway alignment was actually *feasible*. Presumably, plaintiff is contending that a lower subway alignment would allow the use of a tunnel boring machine with its less onerous ecological impacts. Plaintiff relies on several portions of the record to support its feasibility analysis. To begin with, plaintiff relies on the following several sentences in the Connector Partnership's "Alternative Study: More Tunneling on Lower Flower Street": "For the concept of a deeper tunnel that would avoid tiebacks and be in better ground conditions, shafts for access or ventilation, or a station, would have higher cost with greater depth. If several other conditions were favorable to a deep tunnel, the additional cost of deeper structures might be immaterial compared to the benefit." Additionally, plaintiff relies on the following analysis in a memorandum prepared for defendants directors board for its April 26, 2012 meeting: "The pocket track has been eliminated. It has narrowed the cut and cover structure and may have reduced the duration and extent of utility relocation and decking, but the overall project schedule has not improved and the easements are still necessary." Taken together, the cited references to the record failed to constitute substantial evidence that the lower alignment for the subway would be actually feasible.

Further, the Connector Partnership's technical memorandum raises uncertainty as to cost considerations if a lower alignment is used. Economic issues are relevant to the

32

feasibility requirement. (Guidelines, § 15364.) Feasibility is dependent upon a series of factors including economic considerations: "Whether a mitigation measure or alternative is feasible 'involves a balancing of various "economic, environmental, social, and technological factors."' (*City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401, 417 quoting § 21061.1; see Guidelines, § 15364 ['"Feasible"' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors.'].)" (*Citizens Opposing a Dangerous Environment v. County of Kern* (2014) 228 Cal.App.4th 360, 381-382.)

Finally, nothing in the directors' board response to the April 26, 2012 motion of three directors changes matters. The environmental impact report was certified on January 20, 2012. On April 26, 2012, three directors made the following motion concerning use of tunnel boring machine south of Fourth Street: "Over the past 60 days, a number of issues have been examined and the following mitigation measures have been deemed feasible by [defendant]: [¶] Extend the use of a tunnel boring machine . . . under Flower Street to include the area between 4th and 5th Streets up to the intersection of 5th Street and Flower Street. . . . [¶] . . . WE THEREFORE MOVE that Staff should examine various engineering and cost methods to determine if the aforementioned mitigation methods can be incorporated without an increase in the Life of Project . . . Budget and report back in 60 days. [¶] WE FURTHER MOVE that the [directors board] amend the Locally Preferred Alternative . . . of the . . . [p]roject to include the above design features if it can be completed within the current [Life of Project] budget. If [defendant's] staff determines that inclusion of these design features will exceed the [Life of Project] budget, the design features shall be included as proposal options during the construction procurement to allow proposers a process to include each feature and determine if it can be accomplished with the [Life of Project] budget."

The directors board responded as follows to the three directors' motion: "The [b]oard approved the Regional Connector project on April 26, 2012 that included an extension of a tunnel to the 5th and Flower Streets. Staff has been working with various

33

stakeholders regarding the potential construction impacts along Flower Street. [Defendant's] staff and outside engineers both believe this option is technically feasible but there is disagreement whether it can be done within the existing life of the project budget." The directors board then authorized commencement of the procurement bid process that secured separate bid options for both cut-and-cover and tunneling options up to Fifth and Flower Streets. However, the bids were only acceptable if they came in under the life of project budget. If the bids came in under the life of project budget, the tunnel construction technique was to be the preferred construction option. Plaintiff relies on this April 26, 2012 motion and resolution as demonstrating as a matter of law the environmental impact report should have been recirculated. As noted, the environmental impact report was certified on January 20, 2012. We disagree with plaintiff's analysis.

We need not decide the recirculation issue on a basis of *engineering* feasibility. Rather, plaintiff has the burden of proof. Plaintiff has not produced substantial evidence that it is *financially* feasible to use a lower tunneling profile. As we have explained, the feasibility requirement requires a project be economically practicable. As noted, we apply a deferential standard of review to this issue. (*Western Placer Citizens for an Agricultural and Rural Environment v. County of Placer, supra,* 144 Cal.App.4th at p. 903; *Sierra Club v. County of Napa, supra,* 121 Cal.App.4th at p. 1497.) Thus, because plaintiff has failed to sustain its burden of proof concerning the economic feasibility of a deeper tunneling profile, recirculation of the environmental impact report was unnecessary. (§ 21061.1; Guidelines, § 15364; *City of Del Mar v. City of San Diego, supra,* 133 Cal.App.3d at p. 417.)

We need not address whether the development of post-certification feasibility evidence can require that an already certified environmental impact report be recirculated. And we need not decide whether the post-certification development of aspects of a project's feasibility may impeach an earlier environmental impact report certification determination. Here, there is no substantial evidence the lower tunneling profile raised in the April 26, 2012 order was financially feasible.

34

## G. Public Records Act Claim

As noted, the first cause of action alleges a violation of the Public Records Act. Plaintiff's public records disclosure claim may not be pursued on direct appeal. According to the first cause of action, defendant improperly asserted exemptions for disclosure of public records and failed to produce the "Flower Street Tunneling Study" in response to plaintiff's request. Any issue concerning the duty to disclose a public record may not be raised on direct appeal but only by means of a writ petition. (Gov. Code, §6259, subd. (c); *Powers v. City of Richmond* (1995) 10 Cal.4th 85, 110 (lead opn. of Kennard, J.); *MiniCal Consumer Law Group v. Carlsbad Police Dept.* (2013) 214 Cal.App.4th 259, 261, 263-264.) Thus, we may not consider the issue on direct appeal. Further, as plaintiff presents no significant public records issue, no sound reason exists for us to deem the appeal to be a writ petition. (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 744-747; *Olson v. Cory* (1984) 35 Cal.3d 390, 401.)

## IV. DEFENDANT'S CROSS-APPEAL

Defendant cross-appeals, contending its judgment on the pleadings motion, which argues the project was exempt from the environmental impact report requirement, should have been granted. (§ 21080, subd. (b)(12) ["This division does not apply to any of the following activities: [¶] . . . (12) Facility extensions not to exceed four miles in length which are required for the transfer of passengers from or to exclusive public mass transit guideway or busway public transit services"]; see *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1098.) In affirming the judgment on appeal, we are upholding the trial court's approval of defendant's environmental impact report certification. There is no effectual relief we can provide to defendant by reaching the merits of its exemption contention. Thus, all of defendant's exemption contentions are moot. Defendant's cross-appeal must therefore be dismissed. (*Eye Dog Foundation v.*

*State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541; *Steiner v. Superior Court* (2013) 220 Cal.App.4th 1479, 1485.)

## V.  DISPOSITION

The judgment is affirmed.  The cross-appeal is dismissed.  Defendant, The Los Angeles County Metropolitan Transit Authority, shall recover its costs incurred on appeal from plaintiff, Today's IV, Inc.  No costs are to be recovered in connection with the cross-appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P. J.


We concur:


KRIEGLER, J.


BAKER, J.